In re Telesforo RODRIGUEZ,
Jr., Debtor.

Chase Manhattan Mortgage
Corporation, Movant,

v.

Telesforo Rodriguez, Jr., Respondent.

No. 99–30259.

United States Bankruptcy Court,
D. Connecticut.

Nov. 18, 1999.

Edward C. Taiman, Jr., Sabia & Hartley, LLC, Hartford, for Movant Chase Manhattan Mortgage Corporation.

Peter L. Ressler, Groob, Ressler & Mulqueen, New Haven, for Debtor–Respondent.

## MEMORANDUM OF DECISION ON MOTION TO DISMISS CASE

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court fairly tests the limits of appropriate relief in bankruptcy. Specifically, the Court is called upon to determine whether an individual may remain in Chapter 13 for the singular purpose of "stripping down" and retiring a mortgage lien where the underlying obligation was not in default or arrears prepetition. Guided by the expressed purpose and spirit of the Bankruptcy Code, the Court concludes that the Debtor has not commenced or prosecuted this case in good faith, and cannot confirm a Chapter 13 plan in good faith. Therefore, "cause" exists to justify the dismissal of his case at this time.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine the matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2).

### III. FACTUAL & PROCEDURAL BACKGROUND

This matter was submitted to the Court upon an undisputed factual record consisting primarily of documents filed by the Debtor in this case. The following recital of facts was derived from that record, as supplemented by additional evidence stipulated by counsel for the parties during their oral argument.

On January 22, 1999, Telesforo Rodriquez, Jr. (hereafter, the "Debtor"), filed a petition for relief under Chapter 13 of the Bankruptcy Code. The Petition was accompanied by the Statement and Schedules required by Fed. R. Bankr.P. 1007 and the Plan required by Fed. R. Bankr.P. 3015.

On Schedule A the Debtor scheduled an interest in an improved multi-family parcel of real property located at 35–37 Maltby Place, in the City of New Haven, Connecticut (hereafter, the "Multi–Family Residence"). Part of the Multi–Family Residence constitutes the Debtor's principal residence. In addition to more common personal property, the Debtor scheduled $8,000 on deposit in the New Haven Savings Bank. *See* Schedule B.

The Debtor scheduled only one secured claim—that of Chase Manhattan Mortgage Corporation (hereafter "Chase") in the amount of $115,038.64, arising from a promissory note secured by a mortgage on the Multi–Family Residence. *See* Schedule D. There is only one non-priority (*i.e.*

"general") unsecured claim—that of Royal Prestige Credit (hereafter "Royal") scheduled in the amount of $1,644.69. *See* Schedule F.

The Debtor is technically "insolvent", *i.e.* his total scheduled liabilities of $116,683.33 exceed his total scheduled assets of $55,000.00. *See* Summary of Schedules. These figures are based upon a valuation of the Multi–Family Residence at $44,000.00—a fact which is disputed by Chase. Nonetheless, even utilizing Chase's proposed valuation of $67,000.00, the Debtor is still insolvent.

The Debtor has been steadily employed by the same company for 27 years, and enjoys a current monthly gross income of $3,033.33 from such employment. *See* Schedule I. In addition, the Debtor schedules current monthly rental income of $1,100.00. Thus, according to his schedules, the Debtor regularly receives a total monthly *gross* income of $4,133.33, and monthly *net* income of $2,985.00.[1]

The Debtor's Schedules detail monthly expenditures of $2,918.96, including a mortgage payment to Chase in the amount of $1,578.96. *See* Schedule J. The Debtor is single, has no dependents, and is not burdened by child support, alimony, or other similar obligations. He cites no chronic health problems, and appears to have health insurance provided through his employer. At the time the Debtor filed his Chapter 13 petition, he was current on his repayment obligations under the Chase mortgage note, that note was not otherwise in default, and no foreclosure proceedings were pending or anticipated.

On July 1, 1999, the Debtor filed a *Motion to Determine Secured Status*, Doc. I.D. No. 18, seeking a court determination that the fair market value of the Multi–Family Residence was $44,000, and "stripping down" the secured claim of Chase to

that value pursuant to Section 506 (hereafter, the "506 Motion"). By an *Objection to Motion to Determine Secured Status*, filed August 17, 1999, Doc. I.D. No. 18, Chase opposed the 506 Motion, alleging, *inter alia*, that the fair market value of the Multi–Family Residence was "no less than $67,000.00". The 506 Motion has not yet been determined by the Court.

Consistent with the 506 Motion, the Debtor's Chapter 13 Plan treats Chase's claim as *secured* to the extent of $44,000.00, and *unsecured* as to the balance (approximately $71,038.64). The Debtor proposes to fund the Plan with payments of $992.00 per month for sixty (60) months, and in the process entirely satisfy the alleged secured component ($44,000 plus 8% interest) of Chase's claim. The Plan proposes no (0%) dividend on unsecured claims.[2]

On August 9, 1999, Chase filed the instant *Motion to Dismiss with Prejudice* (hereafter the "Dismissal Motion"), Doc. I.D. No. 14, which alleges that "the petition was filed in bad faith and for an improper purpose", and seeks dismissal of the case with a bar precluding "any further filing in the District of Connecticut" for a period of one year. A hearing on the Dismissal Motion was held before the Court on September 8, 1999, at which time the Chapter 13 Trustee appeared and voiced support for the position of the Debtor.

## IV. DISCUSSION

"[W]henever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives." *In re Waldron*, 785 F.2d 936, 941 (11th Cir.1986). Bankruptcy Code Section 1307(c) facilitates such an examination by permitting a court to dis-

---

1. These income levels, and their regularity, are amply supported by the Debtor's Statement of Financial Affairs, which discloses "approximate" income of $53,600 in 1998, $54,000 in 1997, and $52,900 in 1996.

2. Those claims include the general unsecured claim of Royal and the unsecured component of Chase's claim.

miss a case for "cause". That section provides ten examples of "cause"; but in view of the drafters' use of the non-exclusive term, "including", the universe of "cause" is plainly not limited to those enumerated examples.

██ Through Section 1307(c), *inter alia*, "Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose." *Cf. id.* (ruling under Section 1325(a)(3)). Fundamental to a resolution of the matter at bar is the question of whether there has been an attempt to abuse the purpose provisions or spirit of the Bankruptcy Code. *Cf., Matter of Chaffin*, 816 F.2d 1070, 1073 (5th Cir.1987). Stated somewhat differently, a Chapter 13 case is illicit if its pendency is fundamentally unfair to creditors in a manner that contravenes the *spirit* of the Code. *See Matter of Love*, 957 F.2d 1350, 1357 (7th Cir.1992).

In this case the Debtor's obvious and singular purpose for seeking relief under Chapter 13 was to avail himself of the claim bifurcation mechanism of Code Section 506 to "strip down" Chase's secured mortgage debt to the petition date value of the Multi–Family Residence, as permitted under existing authority within this District. *See, e.g., In re Maddaloni*, 225 B.R. 277 (D.Conn.1998) (affirming this Court's reading of Code Section 1322(b)(2) as not preventing lien "stripping" of a claim secured by multi-unit property in which one of the units was debtor's principal residence); *In re Adebanjo*, 165 B.R. 98, 103–104 (Bankr.D.Conn.1994) (allowing "stripping" of lien secured by a three-unit apartment building, one unit .of which was the debtor's principal residence); *In re Del Valle*, 186 B.R. 347, 349 (Bankr.D.Conn. 1995) (allowing "stripping" of a lien secured by a duplex where the debtor lived in one side and rented the other). In effect, by operation of Section 506, the Debtor seeks to shift exclusively to Chase the economic loss resulting from the apparently substantial depreciation of the Multi–Family Residence since its purchase by the Debtor—a depreciation pattern which mirrors to a large degree the progression of value over the last decade of many parcels of residential real property in New Haven, Connecticut. He seeks to advantage himself of lien "stripping" *at this time* because he perceives that the local real estate market—plagued by years of significant depreciation—has "bottomed out", and may even have begun to experience appreciation. Were the Debtor to experience legitimate financial difficulty in the future, and *then* seek bankruptcy relief, the secured component of Chase's claim could be significantly higher. Therefore, the Debtor's present petition for Chapter 13 relief was in the nature of a "preemptive strike", assuring for him alone such appreciation as will likely occur over the coming years.

██ As just stated, under existing authority in this District, a *bona fide* Chapter 13 Debtor may bifurcate a claim secured by multi-family real property (even if part of that property constitutes the principal residence of the debtor), *see id.,* and satisfy the secured portion of such bifurcated claim in a plan which *otherwise* meets the confirmation requirements of 1325. Such a debtor may well reap—consciously or unconsciously—the "windfall" of lien "stripping" at a moment in history when real estate values are at a nadir. But when, as here, the bifurcation mechanics of Section 506 are employed by a debtor who is not in financial distress, and can comfortably continue to pay his debts, the bankruptcy court becomes a tool used to bestow a financial benefit never intended by Congress.

██ The spirit and purpose of the Bankruptcy Code in this respect are not ambiguous. Bankruptcy relief is intended for the benefit of those in financial distress, not for those who would seek to gain a windfall in consensual financial relationships. With particular relevance to this case are the words of Rep. McClory on the Floor of the House of Representatives during consideration of H.R. 8200 (as subse-

quently amended, the Bankruptcy Code of 1978):

> H.R. 8200 prevents the debtor from taking advantage of the bankruptcy laws when the market is low, with a view toward reaping speculative profits if the market turns. This provides much needed protection for mortgage bankers, real estate investment trusts, insurance companies, and other institutions with substantial investments in real property.

124 *Cong. Rec.* H11047, H11116–17 (daily ed. Sept. 28, 1978). These remarks were amplified by Rep. Butler during the same legislative debate:

> H.R. 8200 represents a meaningful achievement in protecting the rights of creditors.... The debtor is prohibited from appraising security and buying out the creditor's interest for the appraised amount unless the creditor consents; this solves a major problem that exists under present law.

*Id.* at H11115.[3]

These statements make plain that Congress intended to foreclose the agenda of those who might seek to use the bankruptcy court to prune liens from a property during a period of relatively depressed values. The agenda of the Debtor in this case is precisely that which Congress sought to preclude. In sum, the Debtor is experiencing no economic distress, and has assets and a demonstrably stable income

---

**3.** These legislative remarks do not identify the bill or Code section(s) which effect the creditor protections to which they allude. But it seems likely to the Court that they refer to present Code Section 363(f). Nonetheless, the remarks are germane to the matter at bar despite their reference to a debtor's *purchase* of his own property, since the agenda of lien stripping and retirement evidenced here is tantamount to a sale to the Debtor at a low appraised value. The sentiment of Congress surely extends beyond the ambit of Section 363(f).

**4.** In his oral argument, counsel for the Debtor placed great emphasis on the fact of the Debtor's insolvency. The Debtor's insolvency was caused not by the accumulation of debt beyond his means, but rather by the severe depreciation of the Multi-Family Residence.

---

sufficient to meet all of his recurring obligations into the foreseeable future.[4]

Given these circumstances, it is plain to the Court that this debtor is attempting to utilize the bankruptcy process as a financial planning "sword", rather than a "shield" against economic disaster. Thus, the Court finds "cause" for the dismissal of this case in the lack of good faith attending the Debtor's filing of the petition, prosecution of the 506 Motion, and proposal of the Chapter 13 Plan.[5] The spirit of this Court's ruling was well-stated by the 11th Circuit Court of Appeals in *Waldron, supra*, to wit:

> The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely require conduct consistent with the concepts of basic honesty. Good faith or basic honesty is the very antithesis of attempting to circumvent a legal obligation through a technicality of the law. The [debtors], it seems clear to us, sought to abuse the process through a technicality to serve their own malevolent and selfish aim. This abuse should not have been permitted.

*Waldron, supra*, at 941.

## V. SUMMARY

Congress created Chapter 13 to provide honest, unfortunate debtors with a

---

While that is an unfortunate situation, it says nothing of his ability to meet his existing obligations.

**5.** The dismissal "cause" found by the Court is closely akin to, and indeed a logical extension of, the enumerated "cause" of Subsection 1307(c)(5), which provides that a case may be dismissed upon the "denial of confirmation of a plan under section 1325 ...." To be confirmed, a Chapter 13 Plan must, *inter alia*, be *"proposed in good faith* and not be means forbidden by law." 11 U.S.C. § 1325(a)(3) (Emphasis supplied). Because the Court finds that the Debtor's Plan is not proposed in good faith, confirmation would be denied on that basis, triggering dismissal under subsection 1307(c)(5). This ruling does little more than advance the day of reckoning for that inevitability.

safe harbor from stormy economic weather. However, Congress never intended to permit financially stable debtors to sail away from debt they could reasonably repay outside of bankruptcy. The Debtor's bankruptcy agenda in this case resembles the course and fortunes of a ship sailed off a calm, steady sea into a sheltered harbor—where it will fatten its hold and then be sailed into even calmer seas. Commencement and prosecution of a case with such purposes must not, and will not, be indulged by this Court.[6] For these reasons an order dismissing this bankruptcy case shall enter this same date.

---

6. The Court declines the movant's request that the prejudice of a one-year bar to refiling attach to the dismissal of this case. Under changed circumstances—should he fall into future financial trouble triggered by layoff, sustained rental losses, illness, or other calamity—the Debtor may well be a *bona fide* debtor entitled to bankruptcy protections.